Michael Garth Moore (023742)
4370 N. Via Entrada Hermosa
Tucson, Arizona 85718
Telephone: 888-318-0075
mike@mgmoorelaw.com

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Jarett Settlemeyer<br>11077 West Jute Way<br>Marana, Arizona 85653 | :<br>:<br>: |
| and | : |
| Eldon "Kitt" Settlemeyer<br>11077 West Jute Way<br>Marana, Arizona 85653 | :<br>:<br>: |
| Plaintiffs | : |
| -vs- | :    Civil Action No. |
| Meghann Ditsch<br>Arizona Department of Child Safety<br>Child Safety Specialist/Investigator<br>3550 North Oracle Road<br>Tucson, Arizona 858705, | :<br>:<br>: |
| and | : |
| | : |
| Aurora Beltran<br>Arizona Department of Child Safety<br>Supervisor<br>3550 North Oracle Road<br>Tucson, Arizona 858705, | :    Jury Demand Endorsed Hereon<br>:<br>: |
| and | |

1

| | |
|---|---|
| Jody Rubin | : |
| Arizona Department of Child Safety | |
| Program Supervisor | |
| 3550 North Oracle Road | : |
| Tucson, Arizona 858705, | |
| | : |
| and | |
| | : |
| Diana Ouillette | |
| Arizona Department of Child Safety | : |
| Facilitator | |
| 3550 North Oracle Road | : |
| Tucson, Arizona 858705, | |
| | : |
| and | |
| | : |
| Mike Faust | |
| Director | : |
| Arizona Department of Child Safety | |
| 3003 N Central Ave | : |
| Phoenix, Arizona 85012, | |
| | : |
| Defendants. | |

## COMPLAINT

### I. INTRODUCTION, PARTIES, JURISDICTION

1. Plaintiffs are husband and wife, and the natural parents and legal guardians of JS, Jr., CS and SS;

2. At all times pertinent hereto, Defendant Meghann Ditsch was a Child Safety Specialist employed by the Arizona Department of Child Safety [hereafter, "AZDCS"]. All the actions taken by her were within the scope and course of her duties, and were taken with malice or in reckless disregard of Plaintiffs' rights under the Constitution of the United States;

2

3. At all times pertinent hereto, Defendant Aurora Beltran was a Child Safety Supervisor employed by AZDCS. All the actions taken by Defendant Ditsch, as alleged herein, were taken with the participation and/or approval of Beltran, who was acting within the scope and course of her duties, and were taken with malice or in reckless disregard of Plaintiffs' rights under the Constitution of the United States;

4. At all times pertinent hereto, Defendant Jody Rubin was a Child Safety Supervisor employed by AZDCS. All the actions taken by Defendant Ditsch, as alleged herein, were taken with the participation and/or approval of Rubin, who was acting within the scope and course of her duties, and were taken with malice or in reckless disregard of Plaintiffs' rights under the Constitution of the United States;

5. At all times pertinent hereto, Defendant Diana Ouillette was a Facilitator employed by AZDCS. All the actions taken by Defendant Ouillette were within the scope and course of her duties, and were taken with malice or in reckless disregard of Plaintiffs' rights under the Constitution of the United States;

6. The above-named Defendants are sued in their individual capacities;

7. Defendant Faust was at all times pertinent hereto, the Director of AZDCS. He is sued in his official capacity;

8. This case is brought to vindicate rights of the Plaintiffs secured by the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States through 42 U.S.C. §1983;

9. This Court has jurisdiction of this case pursuant to federal question jurisdiction, 28 U.S.C. §1331;

10. Venue is proper in this Court pursuant to 28 U.S.C. §1391;

## II. OPERATIVE FACTS

11. Plaintiffs reallege Paragraphs 1 through 10 as if fully set forth herein;

12. On or about April 18, 2018, a report was made through the AZDCS "Hotline" concerning Plaintiffs and the minor children;

13. Plaintiffs have never been apprised of the nature of the allegations made in the report, but understand that it at least in part, made allegations of neglect of CS;

14. On or about April 20, 2018, Defendant Ditsch was assigned to investigate the report. Without informing Plaintiffs, she went to the Plaintiffs' childrens' schools and questioned the children. She first went to Thornydale Elementary, where she attempted to interview SS. Because SS is non-verbal, he could not respond to questions, so Defendant spoke at length with his teacher, Cory Bravo. Ms. Bravo gave Defendant information and her opinion that the Plaintiffs could not have abused or neglected their children. She then travelled to the two other boys' school, and interviewed each. Following that, she contacted Kitt Settlemeyer by telephone and had a brief conversation with Kitt;

15. In the conversation, Kitt expressed dissatisfaction that the children had been interrogated without the parents having prior notice. She expressed concern that AZDCS

was not subject to enough oversight. She expressed her concern that the school district that SS attended was involved in retaliation against the parents;

16. On or about April 25, 2018, Plaintiffs met with Ditsch at their home. Following Ditsch's interviews with Plaintiffs, she informed them that the Department would shortly be issuing a letter finding the report "unsubstantiated;"

17. Plaintiffs never received such a letter;

18. According to information in AZDCS documents subsequently disclosed to Plaintiffs, on May 7, 2018 another "Hotline" report was received by the agency, which, Plaintiffs were later told, involved the allegation that Kitt had physically abused CS and that both parents had neglected him;

19. On May 10, 2018, Defendant Ditsch was assigned to investigate the report. She went to CS's school, the Open Doors Community School and, again without notifying the Plaintiffs, questioned first JS Jr., then CS. CS, in addition to other claims of his mother's violence towards him, claimed that Kitt had hit him with a belt the night before, a Wednesday. He did inform Ditsch that he had suffered a sunburn on May 5$_{th}$. When she examined CS's shoulder, Ditsch viewed sunburn on both, but decided that there "was a possibility that a bruise was forming." On this possibility, Defendant called Marana Police Department (hereafter "MPD") and requested that officers respond;

20. MPD Officer Jared Voigt, along with other MPD officers, responded and met Defendant Ditsch at the Open Doors Community School that morning. At the outset, Defendant advised that CS was claiming the Kitt had hit him over the shoulder

with a belt. She also informed him that a child of Kitt's had been removed by DCS in Kentucky and "has not been re-granted custody";

21. When Officer Voigt interviewed CS in the principal's office, CS told him that his mother "beats him regularly with the black leather belt and a paddle." He also claimed that his mother had beat him Saturday, May $5_{th}$ with the belt after she returned from a vacation to Florida;

22. Upon examination of CS, Voigt could not distinguish any marks from CS being struck on the shoulder. He did confirm a sunburn;

23. After submitting the information and images he had taken of the alleged injury to his superior, he was advised to interview the Plaintiffs;

24. Officer Voigt, other MPD officers, and Ditsch appeared at Plaintiffs' home, and engaged them in interviews about the allegations. Voigt questioned Kitt and Jarett, separately;

25. When Officer Voigt informed Kitt of CS's allegations, she produced social media records, including GPS tracking confirming she was not in town, making it impossible for Kitt to have beaten CS as he claimed;

26. Both Plaintiffs informed the officers of CS's behavioral problems at school and the reports they had received from the school. Kitt informed the officers of her discussions with the school teachers and administrator about the reported incidents. Kitt also described the diagnosis CS had received, and the difficulty Plaintiffs were having in

adjusting dosage of his medication. Kitt informed the officers that she did not want to speak to any DCS investigators;

27. Defendant Ditsch and the MPD officers left Plaintiffs' home. The officers found no probable cause to arrest either Plaintiff on any charge. Ditsch, upon information and belief, reported the situation to her superiors, either Defendant Beltran, or Rubin, or both. She was given direction to return to the Plaintiffs' home and inform them that Kitt would be forbidden to be alone with the children, and that a Team Decision-making Meeting [hereafter, "TDM"] would be held;

28. Later that day, Ditsch returned to Plaintiffs' home where she again spoke with Plaintiffs. She asked Plaintiffs, without giving any detail, if they would agree to a "safety plan." Jarett asked if she had a safety plan with her, which she denied. Ditsch then stated that her supervisor sent her back because CS said he was fearful of Kitt and she cannot leave a child in the home who reports the child is fearful. She directed that Kitt would not be allowed to be alone with any of the children until a TDM was held. As the parents were questioning Ditsch about the nature of the TDM, CS returned home from school;

29. Plaintiffs allowed Ditsch to question CS about his allegation that he was fearful of his mother, and about the allegation that Kitt had struck him with a belt. At this point, CS denied that he was fearful. Jarett informed Ditsch that the redness on CS's shoulder was sunburn that he had treated on Sunday, May 6th;

30. A family friend, and person who cares for the children in the absence of Plaintiffs, Carlos Sanchez, had been with the children on Saturday, May 5th. He came to the home at Plaintiffs request. Mr. Sanchez shared with Ditsch images he had taken of the children playing in a water slide that day – which resulted in the redness that was visible on CS's shoulders;

31. Defendant made no effort to interview the collateral, Carlos, regarding his knowledge of the Plaintiffs' parenting; did not question the DCS investigators who had investigated the previous unsubstantiated allegations made against Plaintiffs; nor did Ditsch seek the names and contact information from Plaintiffs of collaterals who could shed light on the family situation;

32. In the complete "Report to the Juvenile Court For Preliminary Hearing and/or Initial Dependency Hearing" dated June 1, 2018, Exhibit 1 appended hereto, Ditsch made special note that the Plaintiffs recorded at least some of the exchanges between her and them;

33. On May 16, 2018, Plaintiffs participated by telephone in a TDM. Defendant Ouillette acted as the "Facilitator," and present with her were Defendants Ditsch and Rubin. During the course of the TDM[1], Plaintiffs explained in more detail the nature of the behavioral incidents at school, including self-harm, stealing, etc. Jarett informed

---

[1] Audio of the TDM phone call with Defendants was recorded by Plaintiffs on their cell phone.

8

Defendants of their working through the behavioral issues with CS's teacher and the principal;

34. Plaintiffs also began addressing issues CS was having at school, his actions, and that they believed the teacher had filed a false mandatory report on that child. Ouillette cut Plaintiffs off at that point. During the remainder of the TDM, Jarett continued to note his main concern was that there was "no accountability" for a false report to AZDCS, and cited the Arizona statute making such false reports a crime;

35. As Ditsch was giving her statement of allegations about what had, and had not been done, and Kitt attempted to correct what she believed were false impressions, Jarett asked her to stop, because "We trust the lawyers";

36. When Ouillette questioned any concerns Plaintiffs had for their childrens' safety, both parents responded that their concern was about the agency. Kitt expanded upon that in some detail, concerned that by May 10th, after previous involvement with Ditsch, "all of a sudden, he [CS] has this new verbiage and these new ideas [about abuse and neglect]";

37. Following this exchange, Ditsch informed the meeting participants that there was substantiation in other states for physical abuse, and "To me that just shows a pattern that they were there before, and now we're here again with a set of younger children.";

38. At this point, Rubin entered the record expressing her concerns that the Department had, among other things, "a history of physical discipline by Kitt with other children";

39. Following this, Ouillette makes the statement that, "It sounds like there's a lot of minimization, a lot of not working, a lot of shaming and blaming towards the Department.";

40. At this point, Ouillette and Ditsch began to accuse Plaintiffs of "minimization" and a lack of cooperation with the agency, and Ouillette invited Ditsch to narrate what Ditsch claimed was Plaintiffs' failures to follow through and lack of cooperation;

41. At that point in the TDM, Plaintiffs again laid out their actions to address the behavioral issues that CS was having at school, the process of identifying and securing insurance coverage for specialists, and other aspects of their efforts;

42. Following further questioning, Jarett advised that he felt the concerns Ditsch had identified were unfounded;

43. Although Jarett, towards the end of the TDM, continued to express his concern that the school had not acted appropriately despite the parents' efforts to address CS's reported behaviors, and the parents' belief that AZDCS was not acting in the family's interest, the only response was voiced by Ditsch, when she stated that, "The way that you guys are reacting to us, especially you Kitt, is not helping the situation.

Because it's more likely for us to believe that things are happening in the home when you behave that way…."

44. Late in the meeting, Rubin expressed the Defendants' position that Kitt had abused CS, when she stated that:

> DCS right now is saying that we have concerns for the way that the kids are being disciplined. Yes, the law says you can use physical discipline. However, when it comes to the point where children expressing fear and when we have two open reports because of it, that is why I said maybe physical discipline is not the most appropriate thing to use right now, especially if your kids have special needs.

45. After Plaintiffs questioned Defendants about what "services" the Defendants determined the family would require, Ouillette and Rubin implied that the agency would remove the children if they did not agree to services. Kitt responded, "Fine. If it [crosstalk 00:55:00] helps you ... If it gets you out of our lives, we'll take it."

46. But Defendants refused to take "yes" for an answer. Even after Kitt repeated they would accept services, and Jarett voiced, "we need to establish what the plan is", Ditsch rejected the agreement:

> What I am going to decide to do, because it will also give you guys an opportunity to contest this, because that's clearly what you want to do, I am wanting to file what's called an in-home dependency petition with the Yuma (sic) County Juvenile Court, which will state that the children will remain in your physical custody. However, DCS, the state of Arizona, will have legal custody . . .;

47. When Plaintiffs attempted to understand what Ditsch was saying, Ouillette cut them off, with, "You've heard the decision. We need to talk about moving forward then.";

11

48. Defendants then ended the TDM;

49. In the following days, Ditsch, Rubin and/or Beltran prepared Exhibit 1, the "Report to the Juvenile Court";

50. On or about May 22, 2018, Ditsch, Rubin and/or Beltran met with an Assistant to the Arizona Attorney General [hereafter, the "AAG"], and a Dependency Petition was drafted;

51. In deciding to file a dependency petition, AAG Ransom H. Young, relied upon the information given to him by Defendants that there was probable cause to believe that both Plaintiffs were engaged in abuse and neglect of all three children. The information he received was the same as that later memorialized in Exhibit 1, sworn to by Defendants Ditsch and Rubin;

52. The Dependency Petition was filed May 22, 2018, and did allege probable cause to believe that the Plaintiffs were engaged in abuse and neglect of the three boys;

53. AAG Laurie J. Owen was assigned as prosecutor representing AZDCS;

54. Plaintiffs were compelled to secure the services of two separate lawyers. They paid legal fees and expenses during the course of the dependency action. Plaintiffs were compelled to spend time with counsel preparing defenses, and to attend hearings of the Juvenile Court;

55. On or about January 14, 2019, the assigned judge, the Honorable Peter W. Hochuli, rendered judgment in favor of Plaintiffs and against AZDCS;

12

### III. FIRST CLAIM: CLAIM AGAINST THE INDIVIDUAL DEFENDANTS: FIRST AMENDMENT RETALIATION

56. Plaintiffs reallege Paragraphs 1 through 55 as if fully stated herein;

57. Plaintiffs engaged in expression protected under the First Amendment of the Constitution of the United States when they expressed concern and criticism of the school's handling of the situation with their boys after they engaged in advocacy on behalf of the boys; and in their criticism of the actions of the agency and the individual Defendants, as set forth above;

58. The retaliation included, but was not limited to (1) failing to conduct a proper investigation of the allegations made against Plaintiffs, thus intentionally not securing evidence which was exculpatory; (2) manipulating the TDM and torpedoing the process of the TDM in development of a plan for services, after Plaintiffs had assented to participate in such a plan; (3) preparing and submitting to the AAG misleading and false information intended to secure the AAG's agreement to file a dependency petition against Plaintiffs, and (4) preparing Exhibit 1, which included false and misleading information in the form of the implications sought to be drawn from the document in light of material omissions in that document, all intended to secure the judicial conclusion that a dependency case go forward because probable cause existed to compel Plaintiffs' to defend;

59. As a direct and proximate result, the Juvenile Court accepted the submission of the AAG which put Plaintiffs' and their children's future at risk of temporary or permanent separation, exposed Plaintiffs to the stigma of having been

declared to be parents who abused and neglected their children, and, particularly, put Plaintiff Jarett Settlemeyer's professional career in jeopardy;

60.     Plaintiffs, as a result of the Defendants' actions, suffered extreme emotional distress, humiliation and fear, incurred expense and attorney fees, and will suffer further such injuries and losses in the future;

### IV.   SECOND CLAIM: CLAIM AGAINST INDIVIDUAL DEFENDANTS DITSCH, BELTRAN AND RUBIN: JUDICIAL DECEPTION

61.     Plaintiffs reallege Paragraphs 1 through 60 as if fully stated herein;

62.     Under the First and Fourteenth Amendments, Plaintiffs enjoyed the right to the familial association with their children, which included, but was not limited to, their right to make decisions regarding each child's welfare, medical and mental health conditions and education;

63.     Defendants, intending to cut off Plaintiffs' parental rights, at the outset concealed from Plaintiffs those rights, including notice that Plaintiffs could not be subject to the jeopardy of a dependency petition filing because the parents refused to cooperate in the agency investigation and/or declined the agency offer of services;

64.     Defendants, intending to cut off the Plaintiffs' parental rights, presented to the AAG and the Juvenile Court, recklessly or intentionally, among other false evidence, both in the Report to the Juvenile Court and the "TDM Summary" [Exhibit 1] the following:

   a.     that the Plaintiffs' children were fearful of them and that Plaintiffs' "discipline is harsh" and that "neither parent is able to recognize" this;

  b.  that Jarett Settlemeyer's ability to recognize threats to his children was "diminished" because he "does not recognize the son's fear of his mother";

  c.  that Kitt Settlemeyer's tolerance as a caregiver was "diminished" because "the children report she can become out of control and angry;" that the MPD officers "did state concerns to this investigator, which included that "Mrs. Settlemeyer's hostilness (sic) to them left concerned about how she reacts to her children;" and that the officers had "concerns for [Jarett Settlemeyer's] truthfulness;"

  d.  that the parents "did not show" for the TDM;

  e.  that one of the schools had reported that the parents were "hard to reach" and that they were "difficult to get ahold of – despite Plaintiffs' documentation of their continuing communications with the administrator and teachers;

  f.  that during the TDM, "Mrs. Settlemeyer stated she would participate [in DCS-facilitated] services but only because she was forced to";

  g.  that "both parents stated their unwillingness to work with Department in-home team;"

  h.  that there was "a documented history/pattern of physical abuse" by the mother;

  i.  that:

> Due to the previous child abuse history by Mrs. Settlemeyer, the current fearfulness of the child, the pattern of inappropriate discipline, the parents' aggressive stance towards DCS and police; and their unwillingness to work cooperatively with DCS, the Department feels court oversight is needed….

65. Defendants recklessly or intentionally omitted information provided to the AAG's and the Juvenile Court that, among other facts, the exculpatory information Ditsch had obtained from the teacher, Cory Bravo, and the family friend and caregiver Carlos Sanchez, including Sanchez's images of the events of May 5th which resulted in the burns for which CS was treated by his father on May 6th;

66. Defendants concealed from the AAG's and the Juvenile Court the identities of collaterals whose information would be exculpatory of the Plaintiffs;

67. Defendants carefully constructed their presentation to the AAG and the creation of document Exhibit 1, to imply that they had fully investigated and that their evidence more than established probable cause, such as including, among other creative writing, the false information about the MPD officer's "concerns" and the alleged "difficulty" of the Plaintiffs to get ahold of;

68. Defendants' misleading, false information secured the assent of the AAG to file the dependency petition and subsequently the Juvenile Court's commencement of the action against Plaintiffs and the Order giving AZDCS legal custody of the three children;

69. As a direct and proximate result, the Juvenile Court accepted the submission of the AAG which put Plaintiffs' and their children's future at risk of temporary or permanent separation; cut off the parents' right to make decisions regarding their childrens' welfare; exposed Plaintiffs to the stigma of having been

declared to be parents who abused and neglected their children; and, particularly, put Plaintiff Jarett Settlemeyer's professional career in jeopardy;

70. Plaintiffs, as a result of the Defendants' actions, suffered extreme emotional distress, humiliation and fear, incurred expense and attorney fees, and will suffer further such injuries and losses in the future;

### V. THIRD CLAIM: CLAIM AGAINST FAUST IN HIS OFFICIAL CAPACITY

71. Plaintiffs reallege Paragraphs 1 through 70 as if fully set forth herein;

72. Before 2018, the administration of AZDCS knew that the investigators in the field and supervisors were not properly educated about the rights of parents to the care, custody and control of their minor children as set forth by the decisions of the Court of Appeals for the Ninth Circuit construing the rights of citizens under the First and Fourteenth Amendments;

73. Before 2018, the administration of AZDCS knew that investigators and their supervisors were consistently violating their obligations, as set out in AZDCS policies, to conduct full investigations before seeking to have dependency cases filed against parents;

74. Before 2018, the administration of AZDCS knew that the investigators and supervisors were not properly educated in the agency's obligations under A.R.S. §8-806 to offer parents services on a voluntary basis without the jeopardy of the filing of a dependency petition, and the failure of investigators to properly and fully inform parents

of the availability of services, including respite services for parents whose child was in a behavioral crisis;

75. Before 2018, the administration of AZDCS knew that the investigators and supervisors were not taking the necessary steps to propose services under A.R.S. §8-806, nor providing parents with clear notification of their rights under Arizona law and the Constitution; and that such investigators and supervisors were filing dependency petitions without probable cause because of the deficiencies in the AZDCS training and policies as set forth above;

76. The individual Defendants were not properly trained in their obligations under Arizona law and the Constitution;

77. The agency's failure to properly train its staff in the Arizona law and Constitutional limitations on the agency's authority to file dependency petitions, and to properly instruct the staff in obligations to conduct full investigations before deciding to initiate dependency proceedings, constituted conscious indifference to the rights of parents to the care, custody and control of their children;

78. As a direct and proximate result of the conscious indifference of the agency's final decision-makers as set forth herein, the individual Defendants sought to initiate dependency proceedings against Plaintiffs; the Juvenile Court accepted the submission of the AAG which put Plaintiffs' and their children's future at risk of temporary or permanent separation; cut off the parents' right to make decisions regarding their childrens' welfare; exposed Plaintiffs to the stigma of having been

declared to be parents who abused and neglected their children; and, particularly, put Plaintiff Jarett Settlemeyer's professional career in jeopardy;

79. Plaintiffs, as a result of the Defendants' actions, suffered extreme emotional distress, humiliation and fear, incurred expense and attorney fees, and will suffer further such injuries and losses in the future;

WHEREFORE, Plaintiffs demand judgment, jointly and severally, against all Defendants as follows:

1. Against the individual Defendants and Defendant Faust in his official capacity, compensatory damages in such amounts as the jury deems just;

2. Against each individual Defendant, punitive damages in such amounts as the jury deems just;

3. An Order directing Defendant Faust to have issued by the agency a letter confirming that both reports, the first of April 18, 2018, and the second of May 7, 2018, were deemed unsubstantiated;

4. An award of reasonable expenses, including attorney fees, of this action, pursuant to 42 U.S.C. §1988;

5. Interest;

6. Such other equitable relief as the Court deems just.

Respectfully submitted,

/s/ Michael Garth Moore
Michael Garth Moore (023742)
4370 N. Via Entrada Hermosa
Tucson, Arizona 85718

Telephone: 888-318-0075
mike@mgmoorelaw.com

Attorney for Plaintiffs

**JURY DEMAND**

Plaintiff demands trial by a jury of twelve (12) persons as to all issues.

/s/ Michael Garth Moore